**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JEFFERSON AMBULATORY SURGERY CENTER LLC, individually and on behalf of all others similarly situated, | |
| *Plaintiff,* | Case No. 1:24-cv-7941 |
| vs. | CLASS ACTION COMPLAINT |
| MULTIPLAN, INC., HEALTH CARE SERVICE CORPORATION, AETNA, INC., BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY, BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY, BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., ELEVANCE HEALTH, INC., CENTENE CORPORATION, THE CIGNA GROUP, UNITEDHEALTH GROUP, INC., HUMANA, INC., and KAISER FOUNDATION HEALTH PLAN, INC., | ***Jury Trial Demanded*** |
| *Defendants* | |

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A.    MultiPlan is a Direct Competitor With Other Health Insurers ............................. 4

    B.    The MultiPlan Conspiracy .................................................................................... 7

PARTIES ...................................................................................................................... 12

    A.    Plaintiff ................................................................................................................ 12

    B.    Defendants ........................................................................................................... 12

    C.    Co-Conspirators .................................................................................................. 17

JURISDICTION & VENUE ......................................................................................... 17

FACTUAL ALLEGATIONS ........................................................................................ 18

    A.    All Defendants are Direct Competitors ............................................................... 18

    B.    Reimbursements for Out-of-Network Services are a Necessity in the Context of PPO Health Plans ................................................................................ 20

    C.    Relevant Product Market ..................................................................................... 21

    D.    Relevant Geographic Market ............................................................................... 21

    E.    Out-of-Network Reimbursements Were Traditionally Independent Decisions ............................................................................................................. 21

    F.    Defendants' Previous Failed Attempts to Change Traditional Reimbursement Methods ..................................................................................... 22

    G.    MultiPlan Took Action to Carry Out the Conspiracy ......................................... 24

    H.    The Conspiracy's Existence, Agreement, and Coordination ............................... 28

        i.    Direct Evidence ............................................................................................. 28

            a.    Written Agreements ................................................................................ 29

            b.    Public Statements and Correspondence with Healthcare Providers .......... 30

        ii.    Circumstantial Evidence ............................................................................... 32

            a.    Parallel Conduct ..................................................................................... 32

            b.    Plus Factors ............................................................................................ 33

    I.    The Conspiracy Achieved the Goal of Fixing and Suppressing Out-of-Network Claim Reimbursement Rates. ................................................... 38

    J.    MultiPlan and Insurer Defendants also Operate as a "Hub and Spoke" Conspiracy ........................................................................................................... 43

    K.    The Conspiracy Is Per Se Illegal ........................................................................ 47

    L.    The Conspiracy Results in Anticompetitive Harm with No Procompetitive Benefits ................................................................................................................ 47

INTERSTATE COMMERCE ....................................................................................... 50
FRAUDULENT CONCEALMENT........................................................................... 50
CONTINUING VIOLATION ................................................................................... 54
ANTITRUST INJURY AND STANDING ................................................................ 55
CLASS ACTION ALLEGATIONS .......................................................................... 55
CAUSES OF ACTION .............................................................................................. 58
   COUNT ONE ........................................................................................................ 58
   COUNT TWO ........................................................................................................ 59
REQUEST FOR RELIEF ......................................................................................... 61
JURY TRIAL DEMAND ......................................................................................... 62

## INTRODUCTION

1.     Plaintiff Jefferson Ambulatory Surgery Center LLC ("Plaintiff" or "Jefferson") brings this action on behalf of itself and the proposed Class to challenge the conspiratorial conduct of the data analytics firm, MultiPlan, Inc. ("MultiPlan"), acting in concert with and as part of a conspiracy among numerous health insurance companies[1] ("Insurer Defendants") (collectively with MultiPlan, "Defendants") with the goal of artificially reducing reimbursement rates paid to health care providers for out-of-network health care claims.

2.     The distinction between "out-of-network" and "in-network" claims (and the rates at which they are reimbursed by insurers) is key to this conspiracy. In exchange for access to their plan members, health insurance companies and health care providers agree to accept pre-negotiated, heavily discounted contractual rates for their services, which are set by the insurers. These are referred to as "in network" claims. "Out-of-network claims" result when providers have declined to enter into these agreements (often because the in-network rates offered are unreasonably low) and are free to set prices based on what the market can bear.

3.     Since at least July 1, 2017, MultiPlan has conspired with the largest commercial healthcare insurance companies in the United States to fix, suppress, and stabilize the reimbursement rates that insurers pay to healthcare providers for out-of-network healthcare services in the United States.

4.     The Insurer Defendants knowingly and purposefully used and shared "repricing" tools sold and promoted by MultiPlan, enabling and facilitating an anticompetitive scheme that caused Plaintiff and Class Members to receive artificially suppressed reimbursements for out-of-

---

[1] The Insurer Defendants are Health Care Service Corporation, Aetna, Inc., Blue Shield of California Life & Health Insurance Company, Blue Cross Blue Shield of Michigan Mutual Insurance Company, Blue Cross and Blue Shield of Florida, Inc., Elevance Health, Inc., Centene Corporation, The Cigna Group, UnitedHealth Group, Inc., Humana, Inc., and Kaiser Foundation Health Plan, Inc.

network healthcare services provided from July 1, 2017 to the present (the "Class Period").

5.     Plaintiff brings this Class Action Complaint ("Complaint") individually and on behalf of a class of all others similarly situated against Defendants, upon personal knowledge of the facts pertaining to itself, upon information and belief as to all others, and upon the investigation conducted by its counsel.

## BACKGROUND

6.     Jefferson is a physician owned healthcare facility providing same day surgical care on an outpatient basis, and some overnight procedures, to patients in Jefferson Parish, Louisiana.

7.     Jefferson has contracted with certain Insurer Defendants to provide healthcare services on an "in network" basis, meaning that it has agreements with specific commercial healthcare payors[2] ("Payors") where the Payor pays the provider a negotiated price of the healthcare services a patient receives, except for any copayment or coinsurance owed by the patient under the terms of their healthcare plan. Because Jefferson would prefer to set its own prices, it also provides surgical and other healthcare services on an "out-of-network" basis in an attempt to not be constrained by the low rates negotiated by commercial health insurers.

8.     Providers throughout the United States offer services (some of which are provided by Plaintiff) on an out-of-network basis. Patients often arrive at provider facilities with urgent or life-threatening conditions which mut be treated immediately regardless of whether in- or out-of-network. Indeed, Plaintiff and Class Members have a legal obligation to provide emergency care in certain situations and cannot decline to provide these services on the basis of a patient being out-of-network.

9.     The provision of out-of-network medical care on an emergency basis, whether that

_____

[2] A healthcare "Payor," "Plan," or "Network" refers to any payor of commercial health insurance claims, including health maintenance organizations, preferred provider organizations, third party administrators ("TPAs"), leased networks, and "narrow" networks, unless otherwise specified. All Defendants are healthcare Payors.

care is for victims of heart attacks, car wrecks, or any other medical condition, is extremely cost intensive for Plaintiff and the Class. If a Payor does not pay the full cost owed to Plaintiff for healthcare services, Plaintiff is not always able to bill those costs to patients,[3] and thus depends on the amount of reimbursement from Payors.

10.     Competitive reimbursements by Payors are also important for non-emergency medical care, which is frequently provided on an out-of-network basis, including in the case of Jefferson, outpatient surgical procedures.

11.     For health care providers, a substantial amount of revenue is made through commercial insurance reimbursements. Rural medical facilities struggle to cover their rising costs and keep their doors open to the community members who need their services when there is not adequate reimbursement for their services. According to the American Hospital Association, a competitive reimbursement system offering sustainable reimbursement rates "is a matter of survival."[4]

12.     Prior to the use of re-pricing software like that employed by MultiPlan, Payors competed to reimburse healthcare providers for out-of-network services at "usual and customary" ("UCR") rates. Payors independently determined the UCR relying on independent benchmarking databases that aggregated historical pricing information to estimate fair and consistent reimbursement rates. These databases provided a statistical representation of the prevailing market rates charged by

---

[3] The federal No Surprises Act, which took effect on January 1, 2022, prohibits "balance billing" and charging patients more than in-network costs for emergency healthcare services. Even after this law took effect, healthcare Payors have continued to try to minimize reimbursement rates on claims for out-of-network services covered by the law. In fact, MultiPlan advertises that it can still "reprice" these claims using its out-of-network claim repricing tools, such as Data iSight.

[4] Brief of the American Hospital Association as Amicus Curiae in Response to Defendant MultiPlan, Inc.'s Motion to Dismiss, *Adventist Health Sys. Sunbelt Healthcare Corp. v. MultiPlan, Inc.*, 1:23-cv-7031 (S.D.N.Y. Jan. 10, 2024), ECF No. 72 (hereinafter "AHA Amicus Br.").

3

doctors specific to particular geographic areas.

13.     Historically, Payors also competed with one another on the basis of reimbursement rates to ensure healthcare providers would continue to provide out-of-network services to their insurance customers in non-emergency scenarios, where providers could choose to decline to provide care.

14.     Because the cost of providing competitive reimbursements ate into the Payors' ever-increasing profits, Payors disliked this competitive system—describing it as a "pain point" and "major area of concern" as acknowledged by MultiPlan executives in an investor presentation in 2020.[5]

### A.  MultiPlan is a Direct Competitor With Other Health Insurers

15.     Not only did MultiPlan acknowledge that its customers felt the "pain" of paying competitive reimbursements to out-of-network healthcare providers, MultiPlan itself owns and operates several Preferred Provider Organization ("PPO") health insurance networks in direct competition with Insurer Defendants, such as UnitedHealth and Cigna. MultiPlan, as a healthcare Payor, negotiates the reimbursement rates for providers in its network.

16.     MultiPlan then rents out its network to insurers, who, for a fee, get the benefit of the network discounts MultiPlan has negotiated. Insurers can use the MultiPlan PPO as either their primary provider network, or, in the case of larger insurers, to supplement or geographically extend their own preexisting networks.

17.     Starting in the mid-2000s, MultiPlan expanded the scope of its operations through corporate acquisitions, including the purchases of Viant, Inc. in August of 2009 and National Care

---

[5]  Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wpcontent/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.

Network, LLC ("NCN") in June 2011, both of which had developed tools to "reprice" reimbursements of out-of-network claims. "Repricing" in this context means the intentional and artificial reduction of reimbursement rates paid to Plaintiff and Class Members.

18.     MultiPlan's repricing tools  were developed to create algorithmic, artificial models that suppressed reimbursement rates, pushing the rates far lower than traditional competitive rates, and significantly lower than the reasonable rates charged by healthcare providers.

19.     However, because MultiPlan had to compete against other insurers that offered PPO plans in a race to collect providers into its network, it could not effectively use these repricing tools on its own. Unless MultiPlan convinced competing insurance companies to use the same algorithms to suppress reimbursements, providers would simply refuse to treat patients covered by MultiPlan's PPO where possible.

20.     MultiPlan therefore began recruiting its direct competitors to be its co-conspirators.

21.     To advance the recruitment of new members to the conspiracy, MultiPlan held events at luxury resorts and road shows, advertising the repricing tools as an "out-of-network cost containment" or "cost management" solution At these events, MultiPlan's executives met with executives from competing companies and extolled their repricing tools' success in suppressing reimbursement rates and discussed additional methods to suppress rates even further.

22.     MultiPlan also prepared white papers for members of the conspiracy, which include references to the claims repricing strategies adopted by other insurers and provide instructions for implementing the scheme.

23.     MultiPlan also directly benefits in another way from its competitors adopting its repricing tools:  MultiPlan takes a percentage cut of the "savings" of its competitors—i.e., the difference between the bill for out-of-network services and the artificially suppressed reimbursement amount—as a fee for use its repricing tools.

24.     In one road show presentation, MultiPlan claimed that its repricing tool provided insurers "savings of 61%–81% off billed charges" generating billions of dollars annually. In return for sharing in the suppression of reimbursement rates, MultiPlan's co-conspirators in turn pay a fee of 5-7% or as high as 9.75% of the savings to MultiPlan.

25.     MultiPlan massively profits from this strategy, along with the co-conspirator insurance companies. MultiPlan and its co-conspirators charge their customers an even higher percentage of the "savings" —as high as 35% —as a "processing fee." The more the Defendants suppress payments to providers, the more revenue they generate. The revenues generated by MultiPlan from its repricing services have gone from $23 million in 2012, to $564 million in 2020 and $709 million in 2021, and Insurer Defendants continue to choose to pay MultiPlan's high fees to facilitate their rate-fixing scheme.

26.     While the conspiracy began to take form by 2015, the market for reimbursement rates has been subject to anticompetitive schemes in the past by healthcare Payors seeking to suppress out-of-network reimbursement rates by using similar "repricing" tools. A 2008 investigation by the New York Attorney General revealed that from the late 1990s to roughly 2009, insurers, including UnitedHealth, Aetna, and Cigna, fixed these rates through a UnitedHealthcare subsidiary, Ingenix, Inc. ("Ingenix"), which functionally calculated artificial UCR amounts for the industry.[6]

27.     Under the Ingenix scheme, several of the largest competing health insurers shared detailed out-of-network claim information with Ingenix so it could calculate out-of-network reimbursement rates, resulting in claim underpayments of 10% - 28%. The investigation spawned class action litigation and hundreds of millions of dollars in settlements both with private plaintiffs

---

[6] United States Senate, Committee on Commerce, Science, and Transportation, *Staff Report: Underpayment to Consumers by the Health Insurance Industry*, June 24, 2009, available at: https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54

and the government. In 2009, twelve insurers settled with the New York Attorney General, agreeing to stop using Ingenix and contributed financially to the creation of FAIR Health. a new, independent database to store aggregated claim information. Under the terms of their agreement with the New York Attorney General's office, UnitedHealthcare and the other Insurer Defendants had to use FAIR Health exclusively for the setting of out-of-network payment rates for a period of five years, beginning when FAIR became active in 2010.

28.     In 2014, close to the expiration of the five-year term, MultiPlan began to increase its conspiracy recruitment efforts, with the result that by mid-2017, all major health insurance Payors in the United States had joined the conspiracy and were using MultiPlan's repricing tools to suppress out-of-network reimbursements. Once UnitedHealthcare, the largest health insurance company in the United States, joined the conspiracy on July 1, 2017, the conspiracy reached the critical mass necessary to have its desired effects.

29.     The widespread use of MultiPlan's anticompetitive repricing tool continues to dominate the market for reimbursements for out-of-network healthcare services claims. For example, in the sworn testimony of Sean Crandell, SVP of Healthcare Economics at MultiPlan in 2021, Mr. Crandell testified that "all of the top 10 insurers in the U.S." are MultiPlan customers.[7] Indeed, today that number has grown, to include all of the top 15 insurers.[8]

### B. The MultiPlan Conspiracy

30.     Under their agreements with MultiPlan, Insurer Defendants supply real-time, confidential, and detailed claims data for use in MultiPlan's out-of-network claim reprising tools

---

[7] Testimony of Sean Crandell in *Fremont Emergency Services (Mandavis) LTD., et al. v. United Healthcare Insurance Company, et al.*, Case No. A-19-792978-B (November 22, 2021) (Clark County, NV District Court), at 166: 9-15.

[8] https://www.multiplan.us/company/

which include its principal repricing tool, Data iSight, as well as Viant, Pro Pricer, and MARS. This data is ingested or combined in a database used by MultiPlan's repricing tools in a process which requires MultiPlan to be "deeply integrated into the proprietary claims adjudication system of its customers."[9] Defendants further agree to submit healthcare providers' out-of-network reimbursement claims to MultiPlan. MultiPlan's repricing tools and algorithms then use the information in the database—the shared proprietary claims data of numerous co-conspirator insurance companies—to generate a reimbursement rate far lower. That reimbursement rate is "ridiculously low" and "crazy low", in the words of former MultiPlan employees, than the rate generated by using the traditional UCR method.

31.     Through their agreements with MultiPlan, Insurer Defendants commit to using the same repricing method and tools and to have MultiPlan send the artificially suppressed reimbursement rates to providers like Jefferson. MultiPlan then acts as a "mafia enforcer for insurers,"[10] demanding that providers accept the repriced claim in mere days (or even hours), or risk even further reduction in the reimbursement rate. As a condition of accepting the re-priced reimbursement rate for the claim MultiPlan will also forbid providers from seeking additional reimbursement from any other source, leaving no way to mitigate their damages."

32.     A 2018 study by MultiPlan claims it successfully imposes these artificially suppressed, unsustainable rates on providers 99.4% of the time, but the acceptance of these price-fixed rates does not indicate their validity. The widespread use of MultiPlan's repricing tools,

---

[9]    Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wpcontent/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.

[10] Olivia Webb, *MultiPlan, the secret back-end to most of the insurer industry, is going public* (Aug. 5, 2020) Acute Condition, available at https://www.acutecondition.com/p/multiplan-thesecret-backendto#:~:text=Theoretically%2C%20MultiPlan's%20harsh%20negotiation%20tactics,on%20b ehalf%20of%20the%20patient.

particularly among the biggest health insurers, gives Plaintiff and Class Members no realistic option other than accepting these artificially suppressed reimbursement rates. It is also practically impossible for Plaintiff and Class Members to meaningfully negotiate or dispute the pricing of individual claims due to the constant stream of repriced reimbursement demands. Even if Plaintiff and Class Members had both time and resources for individual negotiations on each repriced claim, MultiPlan still holds the upper hand at all times knowing that it repriced the claims as part of a nationwide conspiracy with its largest competitors, and that providers have nowhere to turn for relief. On top of this, some Insurer Defendants have instructed MultiPlan to simply make claims processed using its repricing tools non-negotiable.

33.     Defendants' price-fixing conspiracy has massively affected the healthcare economy. By 2020, MultiPlan was using its repricing tools to underpay 370,000 out-of-network claims per day for over 700 health insurance companies, resulting in total underpayments of $19 billion annually to providers.[11] By 2023, MultiPlan claimed to create savings in the form of its price-fixed underpayments of $22.9 billion.

34.     The inference of a conspiracy can be shown by direct evidence. In MultiPlan's investor presentations and Securities and Exchange Commission ("SEC") filings, MultiPlan acknowledges that its customers include the largest health insurance providers—*i.e.*, the Insurer Defendants. And Insurer Defendants admit that they use MultiPlan's repricing tools to set the reimbursement rate for out-of-pocket healthcare services including UnitedHealth Group, which specifically acknowledges outsourcing its reimbursement rate pricing to MultiPlan to align with its

---

[11]     Churchill    Capital    &    MultiPlan,    *Virtual    Analyst    Day*    (Aug.    18,    2020), https://www.multiplan.us/wpcontent/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.

competitors' pricing.[12] Moreover, MultiPlan facilitated meetings between insurance executives so they could discuss using MultiPlan to suppress out-of-network reimbursements rates. Importantly, MultiPlan makes clear that it combines the private, real-time claims data of all its customers to generate its reimbursement rates. Thus, every Insurer Defendant was well aware that, just as they provided their private, real-time claims data, their competitors would do the same, and all that private data would factor into the reimbursement rate suggested by MultiPlan.

35. Even if this direct evidence were to be discounted, there is significant evidence of collusion based on the parallel conduct of Defendants and the existence of plus factor evidence which suggests that Defendants' actions are inconsistent with unilateral conduct and are instead explicitly coordinated actions and cartel behavior. Such collusion is made infinitely more likely by factors such as a highly concentrated market for out of network healthcare claim reimbursements with high barriers to entry; ample profit motive for both MultiPlan and the Insurer Defendants to participate in the conspiracy; a history of prior collusion among the Defendants and the long duration of their customer relationships; the many opportunities to collude, including events and meetings held by MultiPlan; actions which jeopardize Insurer Defendants' ability to keep providers in-network and are contrary to self-interest unless pursued as part of a collective plan; evidence that shows MultiPlan enforced the conspiracy by redistributing ill-gotten gains to other Defendants; and pervasive and systematic exchanges of price information between the conspiracy members and MultiPlan.

36. As set forth below, Defendants' have committed a per se violation of Section 1 of the Sherman Act since, although MultiPlan and the Insurer Defendants compete horizontally as healthcare Payors, they agreed with one another to artificially suppress reimbursement rates paid to healthcare

---

[12] Testimony of John Haben in *Fremont Emergency Services (Mandavis) LTD., et al. v. United Healthcare Insurance Company, et al.*, Case No. A-19-792978-B (November 10, 2021) (Clark County, NV District Court), at 140: 17-21.

providers for out-of-network services.

37. Even if MultiPlan and the Insurer Defendants were not direct competitors offering rival PPO networks, their scheme can also be described as a traditional hub-and-spoke conspiracy to fix the price of out-of-network reimbursement claims. To illustrate, MultiPlan, as "hub," sits at the center of conspiracy, with contracts or "spokes," with/to the top 15 health insurance Payors in the nation and over 700 other insurance Payors to reprice their out-of-network-claims, while Insurer Defendants have each agreed to use the same repricing methodology, making up the rim of this conspiratorial wheel. This facially anticompetitive conduct is a per se violation of Section 1 of the Sherman Antitrust Act.

38. Moreover, Defendants' conduct neither provides a benefit to competition nor furthers consumer welfare, and its anticompetitive effects vastly outweigh any benefits to Plaintiff and the Class under a rule of reason analysis. The Defendants' agreements to use MultiPlan's repricing tools to set reimbursement rates on out-of-network claims violates Section 1 of the Sherman Antitrust Act because those agreements unreasonably restrain trade and have anticompetitive effects throughout the market for reimbursements for out-of-network healthcare services while providing no countervailing procompetitive benefits.

39. The Defendants' violations of the antitrust laws directly damage the business and property of Plaintiff and Class Members and restrain competition in the relevant market. As a result, Plaintiff and the Class have sustained and continue to sustain economic losses due to Defendants' artificial suppression of reimbursement rates for out-of-network healthcare services.

40. But for Defendants' illegal conspiracy to fix the amount of money offered to providers in exchange for their services, Plaintiff and the Class would have received fair and competitive reimbursements for their out-of-network healthcare services and have therefore suffered precisely the injury and impact which antitrust laws are intended to prevent.

41.      Plaintiff therefore brings this action to recover all damages and other relief necessary and proper under federal antitrust law.

## PARTIES

### A.  Plaintiff

42.      Plaintiff Jefferson Ambulatory Surgery Center LLC ("Jefferson") is a Louisiana state licensed facility specializing in a wide variety of surgical treatments. It maintains its principal place of business in Metairie, Louisiana.[13] Jefferson has four operating rooms and performs a full spectrum of out-patient surgical procedures and provides pre-operation procedures such as lab work, electrocardiograms, and x-rays. Because Jefferson does not have contracts directly with several of the largest health insurance companies, including Cigna, it provides a high volume of out-of-network care to its patients. For these patients, Plaintiff submits out-of-network claims for reimbursement, including to insurers who use MultiPlan's out-of-network claims repricing services and are members of the conspiracy. Plaintiff has received unreasonably low rates of reimbursement on those claims as a result of the unlawful price-fixing conspiracy alleged herein during the Class Period, including within the four years preceding the filing of this Complaint.

### B.  Defendants

43.      **MultiPlan and Its Related Corporate Entities.** Unless otherwise specified, "MultiPlan" collectively refers to MultiPlan, Inc., MultiPlan Holding Corporation, MultiPlan Corporation, Churchill Capital Corporation III, Viant Holdings, Inc., Viant Payment Systems, Inc., National Care Network, LP, and National Care Network, LLC.

44.      MultiPlan, Inc., is a New York corporation with its principal place of business at 115 Fifth Avenue, 7th Floor, New York, New York 10003.

---

[13] Jefferson Ambulatory Surgery Center, *The Center*, https://jasurgery.com/about/ (last visited Aug. 30, 2024).

45.     MultiPlan Corporation is the parent company of MultiPlan, Inc., and the various entities that carry out MultiPlan's operations. MultiPlan Corporation is a publicly traded entity.

46.     MultiPlan Corporation was previously known as Churchill Capital Corporation III ("Churchill Capital"). Churchill Capital was incorporated in Delaware and formed for the purpose of operating as a special-purpose acquisition company, to take MultiPlan Inc. public. Churchill Capital changed its name to MultiPlan Corporation after its acquisition of MultiPlan, Inc. in October 2020. After MultiPlan went public, the private equity firm Hellman & Friedman and the Saudi Arabian sovereign wealth fund became two of its largest shareholders.

47.     MultiPlan acquired Viant Holdings, Inc., a healthcare cost management company incorporated in Delaware and headquartered in Illinois, and Viant Payment Systems, Inc., a healthcare payment solutions company incorporated in Delaware and headquartered in Illinois, in 2010.

48.     MultiPlan acquired National Care Network, LP and its affiliate National Care Network, LLC, health cost management companies incorporated in Delaware and headquartered in Illinois, in 2011

49.     **Aetna, Inc.** ("Aetna"), a subsidiary of CVS Health Corporation, is a Delaware corporation headquartered in Connecticut. Aetna has a commercial insurance network that pays in- and out-of-network healthcare claims from healthcare providers in all 50 states and Washington, D.C. Aetna is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Aetna is a member of the conspiracy and has entered into an out-of-network repricing agreement with

MultiPlan.

50.     **Blue Shield of California Life & Health Insurance Company** ("BSCA") is a California corporation with a principal place of business in California. BSCA is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in California. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self- funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. BCSA is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

51.     **Blue Cross Blue Shield of Michigan Mutual Insurance Company** ("BCBSMI") is a Michigan mutual insurance company. Its principal place of business is in Michigan. BCBSMI is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in Michigan. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. BCBSMI is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

52.     **Blue Cross and Blue Shield of Florida, Inc**. ("BCBSFL") is a Florida corporation with a principal place of business in Florida. BCBSFL is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield-branded health insurance plans in Florida. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid- funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. BCBSFL is a member of the conspiracy and has entered into an out-of-network

repricing agreement with MultiPlan.

53. **Centene Corporation** ("Centene"), a Delaware corporation headquartered in Missouri, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) Medicare Advantage plans, and (4) Medicaid plans. Centene is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

54. **The Cigna Group** ("Cigna"), a Delaware corporation headquartered in Connecticut, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Cigna is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

55. **Elevance Health, Inc**. ("Elevance"), formerly known as Anthem, Inc., an Indiana corporation headquartered in Indiana, includes many Blue Cross Blue Shield plans. Elevance offers health insurance plans in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Elevance is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded

health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Elevance is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

56.     **UnitedHealth Group, Inc.** ("UnitedHealthcare"), a vertically integrated Delaware corporation headquartered in Minnesota, consists of two divisions, UnitedHealthcare and Optum. UnitedHealthcare, the largest commercial health insurance company in the United States, provides health benefit plans. Optum provides other health services. UnitedHealth Group has various wholly owned subsidiaries, including UnitedHealthcare, which pays in- and out-of-network claims from healthcare providers in every state and the District of Columbia. UnitedHealth Group's insurance plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative  service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. UnitedHealthcare is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

57.     **Humana, Inc.** ("Humana"), a Delaware corporation headquartered in Kentucky, is the parent company, or otherwise affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (a) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. Humana is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

58.     **Health Care Service Corporation**, ("HSCS") is an Illinois legal mutual reserve company with a principal place of business in Chicago, Illinois. HCSC licenses certain trademarks and service marks of the Blue Cross and Blue Shield Association and does business in Illinois as Blue Cross and Blue Shield of Illinois. HCSC is the parent company, or is otherwise affiliated or

16

related, to various commercial health insurance plans and prescription drug plans that operate in the United States, including in Illinois, Montana, New Mexico, Oklahoma, and Texas. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of: (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) hybrid-funded health plans, (4) Medicare Advantage plans, and (5) Medicaid plans. HCSC is a member of the conspiracy and has entered into an out-of-network repricing agreement with MultiPlan.

59.     **Kaiser Foundation Health Plan, Inc.** ("KFHP") is a California corporation headquartered in California. KFHP is the parent company, or otherwise is an affiliated or related company, to many commercial health insurance and prescription drug plans operating in the United States. Those plans issue insurance or provide administrative services concerning healthcare claims in the form of (1) fully insured commercial health insurance plans, (2) self-funded administrative service only health plans, (3) Medicare Advantage plans, and (4) Medicaid plans. KFHP has entered into an out-of-network repricing agreement with MultiPlan.

### C.  Co-Conspirators

60.     In addition to each of the Insurer Defendants listed in the paragraphs above, co-conspirators with MultiPlan include any person or entity who has entered into an out-of-network repricing agreement with MultiPlan, used MultiPlan's out-of-network claim repricing tools to process claims for out-of-network healthcare services, or otherwise participated with Defendants in the alleged anticompetitive conduct and have performed and made statements in furtherance of the conspiracy. The exact number of such co-conspirators is unknown at present but Defendants are jointly and severally liable for all acts or omissions of the co-conspirators.

## JURISDICTION & VENUE

61.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337

17

because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

62.     This Court also has jurisdiction over this lawsuit under 28 U.S.C. § 1332(d) as (1) the proposed class has at least 100 Class members; (2) the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and (3) Defendants and at least one Class member are domiciled in different states.

63.     Venue is proper in this District pursuant to Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

64.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22 and Illinois's long-arm statute, 735 Ill. Comp. Stat. 5/2-209(a). Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in Illinois, including by offering health insurance plans in the state; sending confidential, proprietary claims data concerning claims for out-of-network healthcare services provided in Illinois to MultiPlan for use in MultiPlan's database; using MultiPlan and its claim repricing tools to reprice, pay, and negotiate reimbursements for out-of-network commercial health insurance claims arising from out-of-network healthcare services provided in Illinois.

## FACTUAL ALLEGATIONS

### A. All Defendants are Direct Competitors

65.     Defendants operate multiple nationwide PPO networks by recruiting healthcare providers, negotiating reimbursement rates with them, and setting quality and credentialing expectations. For example, Defendant Aetna offers the Aetna Open Choice PPO; Defendant UnitedHealthcare offers UnitedHealthcare Options PPO Plans; Defendant Humana offers Medicare

Advantage PPO Plans; and Defendant Elevance, Defendant HCSC, and other Blue Cross Blue Shield entities offer Blue Choice PPO plans.

66.     Defendants then sell access to these PPO networks as part of a health insurance plan. Subscribers to the insurance plans can access any healthcare provider in the network ("in-network providers") at a reduced rate but will typically pay much more if they choose a healthcare provider who is not part of the PPO network ("out-of-network providers").

67.     MultiPlan owns and operates "the largest independent, nationwide primary" PPO in the United States, called the PHCS Network, including "more than one million health care providers nationwide: 920,000 practitioners, 4,800 acute care hospitals and 87,000 ancillary facilities."[14] A "primary" PPO network serves as the network of healthcare providers for health insurance companies and other payors of commercial health insurance claims that lack "their own direct contractual discount arrangements with providers."

68.     MultiPlan also offers regional PPO networks. MultiPlan's HealthEOS and HealthEOS Plus Networks serve Wisconsin, Michigan, Minnesota, and Illinois and MultiPlan's Beech Street Network serves Alaska, Nevada, and Utah. MultiPlan Network, Beech Street Network, and IHP Network are three of MultiPlan's complementary PPO networks, which allow competing healthcare payors to expand their rosters of in-network providers.

69.     Various entities, such as provider-sponsored and independent health plans, union health plans, and TPAs subscribe to MultiPlan's primary PPO network, and many other entities subscribe to MultiPlan's complementary PPO networks.

70.     MultiPlan sells access to its PPO networks to competing insurance companies and other healthcare payors, including the Insurer Defendants.

---

[14] https://www.multiplan.us/phcs-network-brings-stability-and-flexibility-to-an-evolving-market/

71.     MultiPlan and other commercial health insurance payors are horizontal competitors (*i.e.*, they *should compete with one another in the market for health care services provided to PPO members, including* to contract with healthcare providers and expand the size of their respective networks. Put another way, companies that market PPO networks compete with one another to build larger, broader, and more robust networks. MultiPlan openly admits to competing directly with the PPO networks offered by the Insurer Defendants in order to entice healthcare providers to join. In an Annual Report filed with the SEC, MultiPlan stated its "network-based services" compete "directly with other independent PPO networks," including "with PPO networks owned by our large Payor customers."[15] Similar statements were made by MultiPlan in its Annual Reports from 2021 through 2023.

## B.     Reimbursements for Out-of-Network Services are a Necessity in the Context of PPO Health Plans

72.     PPO health plans are popular and sought-after because members (patients) have a broad choice in healthcare providers, regardless of whether the provider is "in-network" or "out-of-network." In other words, PPOs enable patients to see any out-of-network doctors or specialists at any hospital they may require. This makes access to care easier, enabling insureds to select the doctor they want in the location they want and at the time they need them.

73.     The flexibility offered by a PPO is also important because patients frequently lack a choice regarding the provider of their medical care. For example, emergency care necessitates choosing the most accessible provider at the time of the emergency without considering if the provider is in the PPO network.

74.     In addition, mental health services or substance abuse treatment routinely require

---

[15] MultiPlan Corp., Annual Report (Form 10-K) at 19 (Mar. 1, 2023), https://www.sec.gov/archives/edgar/data/1793229/000179322923000013/0001793229-23-000013-index.htm.

access to out-of-network healthcare providers. .

75.     The ability to utilize out-of-network providers is also important in the situation of a referral to a specialized provider from a primary care physician.

### C.  Relevant Product Market

76.     If a relevant antitrust market is required, the relevant product market here is the market for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services (the "Reimbursement Market"). Within this market, there are submarkets for reimbursements paid by each specific commercial insurer (or other Payor) for the out-of-network medical services provided to their insureds. In this market and its submarkets, healthcare providers like Plaintiff function as sellers of out-of-network medical services, while commercial insurers like Defendants function as buyers of those services.

### D.  Relevant Geographic Market

77.     If a relevant antitrust market is required, the relevant geographic market is the United States.

78.     Medical providers in the United States have no reasonable substitute in that they cannot reasonably turn to payors in other countries to be reimbursed for out-of-network medical services. The United States healthcare industry, including the Reimbursement Market, is distinct from healthcare industries in foreign countries and is subject to a variety of unique federal and state laws and regulations that apply only in the United States.

79.     The entire United States is also an appropriate geographic market because healthcare providers can (and do) rely on commercial insurers located throughout the United States for reimbursement of out-of-network services.

### E.  Out-of-Network   Reimbursements   Were   Traditionally   Independent Decisions

80.     Prior to the conspiracy alleged here, each Defendant unilaterally decided how much

21

it would pay for out-of-network medical services. Each Defendant had a competitive incentive to reasonably reimburse their out-of-network providers so that they would continue to provide services. Increasingly, however, Defendants began to view the payment of out-of-network services as simply cutting into their profits.

### F. Defendants' Previous Failed Attempts to Change Traditional Reimbursement Methods

81.     Defendants employed various tools aimed at underpaying reimbursements for out-of-network care.

82.     In 2008, the Attorney General for the state of New York opened an investigation of Ingenix, a company that created tools to help insurers determine their reimbursement rates for out-of-network care. Ingenix is a subsidiary of UnitedHealth Group, Inc. This investigation brought to light that competing health insurers shared detailed out-of-network claim information with Ingenix in order to calculate out-of-network reimbursement rates. These actions on the part of Ingenix resulted in an underpayment for out-of-network claims by 10% to 28%, thereby increasing costs for consumers.

83.     In January and February of 2009, several insurers settled with the New York Attorney General: (1) UnitedHealth agreed to shut down the Ingenix database and contribute $50 million toward the creation of FAIR Health an independent database housing more aggregated information; (2) Aetna ended its relationship with Ingenix and paid $20 million toward FAIR Health's development; and (3) WellPoint, Inc. agreed to stop using Ingenix and contributed $10 million towards FAIR Health.

84.     FAIR Health was widely used throughout the commercial health insurance industry as the gold standard in understanding health care cost and for pricing out-of-network reimbursements. FAIR Health was an effort to provide transparency regarding health insurance to both consumers and practitioners by making healthcare claim records available to consumers, researchers, businesses, and

more. FAIR Health organizes claims data by procedure code and geographic area and employs a statistical outlier methodology to exclude extremely low and extremely high values that might otherwise distort the distribution of data. FAIR Health also serves its transparency mission by allowing consumers to input their ZIP code, select a specific medical procedure, and see an estimate of the in-network and out-of-network cost for that procedure.

85.     UnitedHealth's Ingenix scheme also led to civil class action litigation, including a $350 million settlement whereby UnitedHealth agreed to use the FAIR Health database for five years. Another insurer, Health Net, now part of Centene, agreed to pay $215 million to resolve a different suit alleging that it held their out-of-network reimbursements rates inappropriately low based on flawed reports of providers' charges produced by Ingenix.[16]

86.     The agreements between the New York Attorney General and the insurance providers who were using Ingenix to artificially undervalue reimbursements ensured providers would use an independent database to determine reimbursement rates. But these agreements only required that insurers use the database "to help determine reimbursement rates for a period of at least five years." Thus, when the terms of these agreements expired in 2014, insurers, including Defendants, immediately undertook efforts to get back to the way things were—that is, using repricing tools to undervalue reimbursements.

87.     Accordingly, when Defendants' obligations to use the FAIR Health database lapsed, MultiPlan stepped up to fill in this gap as Senator Klobuchar[17] explained:

_____

[16] "*Judge approves Health Net settlement of $215 million*," Gregg Blesch, Modern Healthcare, July 24,                                                                                                           2008, http://www.modernhealthcare.com/apps/pbcs.dll/article?AID=/20080724/REG/977494692

[17] April 29, 2024 Letter from Senator Amy Klobuchar to Lina Khan (FTC) and Jonathan Kanter (DOJ),        https://www.klobuchar.senate.gov/public/_cache/files/4/4/4463fdf7-457e-4e48-b885-9dca394c57d4/7F84E808973057BD75668746A378A06B.4.29.2024-letter-to-doj-ftc-re-multiplan-insurance-payments.pdf

After the settlement expired, there was a concerted shift by numerous insurance companies toward MultiPlan's for-profit services. Freed from the constraints of the settlement, MultiPlan has now positioned itself as a central hub that gathers out-of-network payment data across the industry and uses algorithmic tools to process this data to recommend artificially low payments to physicians potentially at the expense of employees or patients.

### G. MultiPlan Took Action to Carry Out the Conspiracy

88.      In or around 2006, MultiPlan implemented "MultiPlan 2.0," —a scheme whereby the company acquired other companies who had created tools to "reprice" out-of-network claims submitted by healthcare providers. For example, in 2009, MultiPlan acquired Viant from Welsh, Caron, Anderson & Stower which led United States' antitrust regulators to express concern on the acquisition and the Department of Justice's Antitrust Division to open an investigation of the transaction. In 2011, MultiPlan acquired NCN for its iSight repricing tool. Later, in 2014, MultiPlan acquired Medical Audit & Review Solutions in order to sure up the payment integrity market.

89.      MultiPlan utilized these tools to suppress and fix the prices insurers pay for out-of-network claims by pricing those services at levels far less than what the insurance company would otherwise pay and far less than the healthcare provider's claim for reimbursement.

90.      At first, MultiPlan used these analytic tools to reprice only its own out-of-network claims submitted to its PPO networks; however, with the great success of the venture, it set out to, and ultimately did, convince other insurance companies to utilize these tools as well, making this an industry wide suppression of pricing and payments.

91.      MultiPlan 2.0's tools drove deep technological connections between MultiPlan and its purported competitors, including the Insurer Defendants. In the agreements between MultiPlan, the Insurer Defendants, other competitors' claims are sent to MultiPlan by way of an electronic data interchange. These claims include detailed information such as the procedure code, dates of service, the billed amount, and an alphanumeric code indicating whether the claim is subject to an insurance

24

network's previously disclosed reasonable and customary out-of-network rates.

92.     Through the use of MultiPlan's "Claims Savings Engine," (known as FRED), and pursuant to contracts between MultiPlan and the Insurer Defendants, claims are submitted, stored, and then rerouted to one of MultiPlan's proprietary algorithms. These include Data iSight, Viant, Pro Pricer, and MARS. These algorithms then apply the agreed-on claims' suppression methodology to each claim to determine what minimum price can be offered to a healthcare provider for the good or service in question and still be accepted.

93.     Although the exact methodology behind MultiPlan's claims suppression tools is non-public and proprietary, upon information and belief, there exist internal MultiPlan white papers that describe the relevant pricing processes.

94.     Apart from this currently unobtainable information, MultiPlan's United States patent (U.S. Patent No. 8,103,522) ("iSight Patent") filed by its subsidiary, National Care Network, LLC, regarding its Data iSight tool, allows some insight of the repricing mechanisms. The iSight Patent details that MultiPlan groups out-of-network claim information, received from Insurer Defendants, into a refined diagnosis related groups ("rDRG"), a standardized method of grouping insurance claims used by Medicare and some commercial health insurance networks. MultiPlan then identifies all claims at similar hospitals for the same rDRG code and attempts to estimate the hospital's cost based on that group of hospitals' submissions to the U.S. Centers for Medicare and Medicaid and the wage index of the hospital submitting the out-of-network claim. Next, MultiPlan uses an equation $[((\text{Average Charge}) - (\text{Average Cost}) / (\text{Average Cost})) \times 100]$ to calculate the markup and margin for each submitted rDRG-coded out-of-network claim.

95.     Out-patient treatment claims are processed differently, because medical billing does not use rDRGs. Instead, Data iSight uses the HCFA Common Procedure Code System (or HCPCS). A single medical bill for out-patient care may contain many itemized lines, each identified by an

HCPCS code. Data iSight benchmarks each HCPCS code to the median cost for that specific code in MultiPlan's database. A narrow margin is added, and the sum is then adjusted for the billing providers' local wage index. Data iSight then adds together the wage adjusted median cost for each line of the bill. This process—whether for an in-patient or out-patient claims—yields a "recommended payment" that MultiPlan then returns to the insurer.

96. A simple illustration of MultiPlan's repricing tools would be as follows: an individual insured through one of MultiPlan's competitors receives out-of-network services from Provider A. Provider A does not have a pre-existing contract with the insurer that governs the cost of the services. Provider A treats the patient and submits a claim to the patient's insurer. Instead of simply paying Provider A's claim itself, the insurer turns the claim over to MultiPlan who then runs it through its analytic tools and algorithm to "reprice" the claim pursuant to the agreement between MultiPlan and the insurer. After its tools have run their course, MultiPlan contacts Provider A directly with the repriced claim, offering a take-it-or-leave-it partial payment for Provider A's original claim.

97. MultiPlan's executives have publicly boasted about its collection of historical claims data from insurers and explained the value of having such large quantities of data. In an August 18, 2020 presentation, MultiPlan explained that their repricing tools were "unique" because they "ingest data from customers" by "integrat[ing] its systems "quickly and easily" with their customers systems. "[T]his data is in the form of a claim." MultiPlan then "store[s] and move[s] this claim across our platform to our various products, algorithms and intelligence engine" "to develop solutions" to its customers' problems, such as "out-of-network claims" that were "the biggest pain point for our customers." MultiPlan does all of this in "real-time." As a result, MultiPlan is "deeply embedded in their [customers'] claims adjudication process." This "deep integration into" their customers systems

gives MultiPlan "far better data sets" than their competitors.[18]

98.    In all, MultiPlan has access to about twelve petabytes of unstructured data for which they are the self-proclaimed "stewards of" and is used for the purpose of generating savings. For example, Paul Galant, Operating Partner of Churchill Capital Corp. III, which later became MultiPlan, stated: we see data across 700 payers. That data is much, much larger and more diverse than what any single payer has within their system and so that is a massively important point of differentiation. We build our algorithms on a much larger data lake. And because we do that, we believe our products generate bigger savings, whether it's payment integrity or analytics. MultiPlan relies on the real-time, proprietary claims data from *all* its customers to reprice out-of-network claims. Therefore, the uniqueness of MultiPlan's repricing tools is in the large quantity of data they utilize which comes from *all their customers' competitors.*

99.    Mr. Galant went on to explain that because MultiPlan centralizes claim data from a wide swath of competitors, this reduces the reliance on any single Defendant's data and makes MultiPlan the "gold standard" for the "entire industry." MultiPlan can aggressively "push for savings" since it has data from all the Payors' competitors and knows the Payors proposed reimbursement rate making it an effective enforcer of the conspiracy.

100.    MultiPlan also charges a fee (somewhere between 5-10%) for use of its repricing services which is based on the difference between a healthcare provider's original claim and the amount the provider accepts following MultiPlan's repricing. This incentivizes MultiPlan to recommend the lowest reimbursement price possible so that it may profit on the difference.

101.    The conspiracy works to halt competition with respect to the reimbursement of out-

---

[18]   Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wpcontent/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf., at 20.

of-network claims thereby allowing MultiPlan and the Insurer Defendants to artificially underpay those claims and artificially inflate the profits of their PPO insurance plans.

102.     As Senator Amy Klobuchar articulated in a letter to the DOJ and FTC: "I am concerned that—rather than competing for business from employers by reducing these costs to employees—[MultiPlan's] algorithmic tools are processing data gathered across numerous competitors to subvert competition among insurance companies."[19]

103.     MultiPlan admits that it reaches more than 100,000 health plans covering more than 60 million people. This vast reach, coupled with the agreement to fix prices, leaves healthcare providers no alternative but to accept MultiPlan's artificial repricing.

### H. The Conspiracy's Existence, Agreement, and Coordination

104.     In addition to acquiring various analytical tools to reprice and decrease out-of-network payments pursuant to "MultiPlan 2.0," MultiPlan also engages in other activities to ensure the success of the conspiracy. The alleged conspiracy here between MultiPlan and the Insurer Defendants is supported by both direct and circumstantial evidence.

#### i.     Direct Evidence

105.     Direct evidence of the conspiracy to artificially lower out-of-network reimbursement payments includes: (1) written agreements between MultiPlan and the Insurer Defendants; (2) information sharing between and among Defendants, including internal communications between co-conspirators; (3) public statements to healthcare providers and investors indicating the existence of the conspiracy; and (4) MultiPlan's iSight Patent laying out a methodology to suppress out-of-network reimbursements to healthcare providers.

---

[19] April 29, 2024 Letter from Senator Amy Klobuchar to Lina Khan (FTC) and Jonathan Kanter (DOJ), https://www.klobuchar.senate.gov/public/_cache/files/4/4/4463fdf7-457e-4e48-b885-9dca394c57d4/7F84E808973057BD75668746A378A06B.4.29.2024-letter-to-doj-ftc-re-multiplan-insurance-payments.pdf

### a. Written Agreements

106.     MultiPlan has entered into contracts with over 700 healthcare Payors, nearly every healthcare Payor in the United States. Nearly all of these contracts include an agreement to use MultiPlan's "repricing" and "data integrity" tools to suppress payments on out-of-network healthcare claims and split the revenue generated by this underpayment.

107.     Upon signing MultiPlan's out-of-network claims repricing services contracts, each of the Insurer Defendants agreed to set payment preferences through mutual agreement with MultiPlan, and specifically also agree to use MultiPlan's "recommended" reimbursement rates as long as those rates are "consistent with the business criteria mutually agreed upon between [the Insurer] and MultiPlan." Through these provisions, insurers delegate to MultiPlan control over key business decisions that directly impact payment rates. The fact that all of MultiPlan's insurer clients uniformly give up control to MultiPlan in this way enables MultiPlan and the Insurer Defendants to achieve the common goal of suppressing payment rates across the board.

108.     MultiPlan's written agreements with Insurer Defendants also demonstrate that each of the Defendants intended to participate in the unlawful conspiracy for the long term, as each of their contracts range from 2-5 years in duration and automatically renew.

109.     Insurer Defendants admit they have such agreements with MultiPlan. For example, UnitedHealth admits that it may offer healthcare providers a "rate recommended by Viant, an independent third-party vendor that collects and maintains a database of health insurance claims for facilities, then applies proprietary logic to arrive at a recommended rate."

110.     MultiPlan admits, in filings to the SEC, that it enters into these repricing agreements

with its competitors.[20]

111.     Every member of this conspiracy also knows that its competitors have entered into substantially the same agreement with MultiPlan and numerous healthcare providers promote that they have "contracted with" MultiPlan's PPO network. Communication and Information Sharing Among Defendants

112.     MultiPlan's communications and information sharing with the Insurer Defendants are further direct evidence of the existing agreement.

113.     MultiPlan and Insurer Defendants have agreed to exchange, and are actually exchanging, data regarding health care providers' claims, reimbursement offers to those providers, and the actual amounts paid on those claims pursuant to their contracts and the larger conspiracy. This non-publicly available information was exchanged in real time by transmitting it automatically to MultiPlan through electronic links between MultiPlan and each insurer.

114.     In a more blatant example of communication between Defendants, a 2016 email sent from MultiPlan former Chief Revenue Officer, Dale White described to United Healthcare executives precisely what the aim of sharing confidential vital pricing data was, stating, "[w]e believe implementation of these initiatives will go a long way to bringing United back into alignment with its primary competitor group [Blues, Cigna, Aetna] on managing out-of-network program costs."

### b. Public Statements and Correspondence with Healthcare Providers

115.     Defendants have also openly admitted to the existence of the conspiracy in public communications and correspondence with healthcare providers.

116.     In August 2020, MultiPlan signaled to its co-conspirators that "MultiPlan has a large

---

[20] MultiPlan, Inc. Annual Report (Form-10K) at 13-14 (Feb. 29, 2024). Available at: https://d18rn0p25nwr6d.cloudfront.net/CIK-0001793229/00ed039b-35d4-4b46-a346-469655531943.pdf

and sticky customer base of 700+ payers, including all large national carriers. Many relationships, including its largest customers, span decades. Top 10 customers have been customers for an average of 25 years. Contracts with large customers generally have terms of 2 to 5 years."[21] MultiPlan went on to tout: "[w]e are the leader in out-of-network cost containment for our customers and have multi-year contracts with the leading payers."[22]

117.    In a November 12, 2020 earnings call, MultiPlan again made overtures to its co-conspirators about the strength of the conspiracy stating: "our contracts with the large payers [UnitedHealthcare, Cigna, and Aetna] are multiyear" and openly admitted to the success of the collusion between it and Insurer Defendants stating: "in almost every case, the out-of-network business, MultiPlan is in that first position and receives almost all of the out-of-network claims. So we get first look at all the out-of-network claims."[23]

118.    In the same call, MultiPlan was not shy about its dominance in the market stating that the necessity of its product to its customers "has created a competitive moat around our company that drives high recurring revenues."[24]

119.    In a February 2023 news release, MultiPlan assured its co-conspirators of the continuing viability of the conspiracy stating: "[w]e are pleased to announce that, since our last

---

[21]    Churchill    Capital    &    MultiPlan,    *Virtual    Analyst    Day*    (Aug.    18,    2020), https://www.multiplan.us/wpcontent/ uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf.

[22] *Id.*

[23]    Transcript    of    MultiPlan    Earnings    Call,    Nov.    12,    2020,    available    at: https://www.multiplan.us/multiplan-corporation-announces-earnings-call-time-change-third-quarter-2020-earnings-call-on-november-12-2020-at-800-a-m-eastern-time/

[24] *Id.*

earnings call, we renewed a multi-year contract with another one of our larger customers."[25]

120.    Even as of the filing of this Complaint, on its website, MultiPlan brags that "all 15 of the nation's top 15 healthcare payors" have agreed to use MultiPlan's out-of-network claims repricing services.[26]

121.    MultiPlan has also made statements to healthcare providers regarding the existence of the conspiracy. Take for example Jeffrey Farkas, M.D., LLC, who submitted a claim for $332,300 to Great-West Healthcare d/b/a Cigna Corp. for out-of-network services performed on February 17, 2016. Farkas received a response via fax *from MultiPlan*, which revealed that Great-West Healthcare, now part of Cigna, had contracted with MultiPlan to facilitate resolution of the above referenced out-of-network services. MultiPlan offered Farkas only $12,407 as reimbursement for the out-of-network services performed. MultiPlan imposed a two-day deadline for Farkas to accept its offer.

### ii.  Circumstantial Evidence

122.    Because there exists direct evidence of the conspiracy, circumstantial evidence is not necessary; however, substantial circumstantial evidence points to the existence of the conspiracy.

### a.  Parallel Conduct

123.    Defendants also use the MultiPlan repricing model to capitalize on their existing agreements with administrative services only ("ASO") insurance plans where the employer of an insured pays a monthly fee to an insurance company — called a per member, per month fee — and the insurance administers the plan. Premiums are paid to the employer and the employer pays its employees' claims. If employers decide to use ASO plans, they must enter into multiple explicit

---

[25] MultiPlan News Release, "*MultiPlan Reports Fourth Quarter and Full Year 2022 Results*", Feb. 28, 2023, https://s26.q4cdn.com/607044225/files/doc_news/MultiPlan-Reports-Fourth-Quarter-and-Full-Year-2022-Results-2023.pdf

[26] MultiPlan, "*Who is MultiPlan?*", https://www.multiplan.us/company/ (last visited Aug. 30, 2024).

agreements with both health insurers and MultiPlan that cause the suppression of out-of-network reimbursement payments to healthcare providers. And insurance companies administering these plans enter "shared savings agreements" with MultiPlan permitting them to send out-of-network claims for ASO employers to MultiPlan for repricing.

124.    Acting in concert, Insurer Defendants added new terms to their ASO contracts requiring self-insured groups to pay a percentage of the difference between a billed out-of-network charge and the amount actually paid on that claim. These fees are known as the "shared savings fee" or "processing fee."

125.    These "shared savings agreements" allow insurance companies to retain a significant percentage of the savings they capture for their ASO clients by utilizing MultiPlan's analytic tools to artificially suppress reimbursement amounts for out-of-network claims.

126.    The impact of these "shared savings fees" or "processing fees" is staggering, allowing the Insurer Defendants to collect more in fees than they pay in reimbursements to healthcare providers.

127.    MultiPlan facilitated this conduct by marketing its ability to create savings by underpaying out-of-network claims. Because of MultiPlan's coordination efforts, nearly all major insurance companies have now implemented these "shared savings" strategies.

### b.  Plus Factors

128.    "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."[27] MultiPlan's conspiracy evidences several "plus factors" consistent with coordinated action: (1) high market concentration of conspiracy members; (2) high barriers to

---

[27] William E. Kovacic, Robert C. Marshall, Leslie M. Marx & Halbert L. White, *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393 (2011).

entry; (3) motive to conspire; (4) history of prior collusion; (5) ample opportunities to collude; (6) actions against self-interest that are logical only as part of a common plan; and (7) consistent and widespread information exchange between conspiracy members and MultiPlan.

129.    **High Market Concentration of Conspiracy Members**. The relevant product market here is for reimbursements paid by commercial insurers to healthcare providers for out-of-network medical services. There are submarkets for reimbursements within the relevant product market paid by each commercial insurer (or payor) for the out-of-network medical services provided to patients enrolled in that insurer's health insurance plan. Healthcare providers like Plaintiff are sellers of out-of-network services and commercial insurers, such as MultiPlan, are buyers of those services.

130.    Healthcare providers like Plaintiff have no reasonable substitutes for the reimbursements by commercial insurers for out-of-network medical services. Pursuant to federal and state laws, it is illegal for healthcare providers to seek reimbursements from insureds for most out-of-network claims. Defendants force healthcare providers to give up any reimbursement from insureds as a condition of receiving any compensation at all.

131.    Defendants collectively control at least 90% of the relevant market and almost every commercial insurer participating in the relevant market has agreed with MultiPlan to constrain out-of-network reimbursement payments.

132.    Moreover, the relevant geographic market in this case is the United States. It is not feasible for medical providers in the United States to do business with payors in other countries where private medical insurance does not exist or is uncommon

133.    Defendants' high market concentration is circumstantial evidence of agreements to conspire which permits the MultiPlan conspiracy to result in anticompetitive effects on the relevant market.

134.     **High Barriers to Entry in Relevant Market**. There are high barriers to entry in the Reimbursement Market. These barriers include significant capital and time expenditures for new entrants, as well as the necessity to develop a healthcare provider network sufficient to compete as a commercial healthcare insurer.

135.     The risk exists for new health insurance networks that if they are unable to balance claims paid and revenue generated through premiums or network access fees, their capital reserves may be consumed quickly.

136.     Additionally, new entrants would be unable to compete with MultiPlan's repricing scheme. They would need to spend enormous funds to develop and constantly improve algorithms and source code to reprice out-of-network claims in order to compete with MultiPlan's repricing, as well as develop relationships with commercial insurance networks.

137.     Moreover, by securing the iSight Patent, MultiPlan erected another high barrier to entry in a market where it faced almost no competition from other claims repricing companies. For example, MultiPlan processed 273 times more claims than its closest competitor, Zelis. The iSight Patent ensured that MultiPlan could prevent anyone from launching a competing product until the patent expires in October 2029.

138.     **Profitability Motive to Participate in the Conspiracy**. The conspiracy works to halt competition with respect to the reimbursement of out-of-network claims thereby allowing MultiPlan and the Insurer Defendants to artificially underpay those claims and artificially inflate the profits of their PPO insurance plans.

139.     MultiPlan admits that it reaches more than 100,000 health plans covering more than 60 million people. This vast reach, coupled with the agreement to fix prices, leaves healthcare providers no alternative but to accept MultiPlan's artificial repricing. There is clear financial motivation to engage in the alleged conspiracy to suppress reimbursement payments for out-of-

network services. Put simply, the larger the spread or underpayment to the healthcare provider that MultiPlan can propose, the more money it makes. Similarly, the Insurer Defendants make more money by offering and paying the suppressed reimbursement rates for out-of-network services proposed by MultiPlan.

140.     Defendants are financially incentivized to suppress reimbursement payments for out-of-network services. MultiPlan makes money only if members of the conspiracy succeed in suppressing out-of-network reimbursement payments. The more the conspiracy suppresses reimbursements, the more MultiPlan is compensated. Similarly, other Defendants are motivated to suppress payments to healthcare providers in order to increase their profits. Defendants charge their customers a percentage of the difference between the provider's billed amount and the amount actually paid as a "shared savings fee" or a "processing fee" which can result in large revenue for insurance companies and enormous customer expenses.

141.     **History of Prior Collusion**. There is ample evidence of a prior history of collusion between the parties. As discussed above, the New York Attorney General's investigation of UnitedHealth's subsidiary, Ingenix, revealed a conspiracy in which competing health insurance providers were sending detailed information on their out-of-network claims to Ingenix to be included in a database that was used to calculate reimbursement rates.

142.     UnitedHealth and its co-conspirators, including Aetna and WellPoint, agreed to stop utilizing Ingenix and instead paid large sums toward the creation of the unbiased database, FAIR Health.

143.     Moreover, Defendants had, and continue to have, many opportunities to conspire, including through MultiPlan's road shows. For example, in 2019, health insurance executives, including those from Insurer Defendants, met in Laguna Beach, California where MultiPlan executive, Dale White, stated there were "a few things up MultiPlan's sleeve" that might benefit those health

insurers.

144.    Other collusive opportunities for many of the Defendants were available through their participation as members of industry associations such as AHIP (formerly "America's Health Insurance Plans"). Aetna, Centene, Cigna, Elevance, HCSC, Humana, and many others are members of AHIP.

145.    AHIP's website states it "harnesses the collective expertise of health insurance providers …." and its "members provide health care coverage, services, and solutions to hundreds of millions of Americans every day."[28]

146.    Several of Defendants' executives hold positions on AHIP's Board of Directors, including Gail K. Boudreaux, President and CEO of Elevance Health; David Cordani, Chairman and CEO of The Cigna Group; Maurice Smith, President, CEO, and Vice Chair of HCSC; Sarah Londone, CEO of Centene Corporation and Jim Rechtin, President and CEO of Humana Inc..[29] AHIP hosts conferences, retreats, committee meetings and board meetings multiple times a year where its members participate in closed-door meetings.

147.    **Defendants' Actions Against Self-Interest**. The agreements between MultiPlan and Insurer Defendants are not in the conspiracy members' self-interest. If an individual insurance provider entered into an agreement with MultiPlan and veered away from the usual and customary methodology to substantially underpay out-of-network claims, healthcare providers as a whole would refuse to treat patients who subscribe to that provider — for example, in non-emergency situations. This in turn would negatively impact that health insurance provider's business and would be less likely to bring healthcare providers in-network, which would further reduce value and earnings.

---

[28]    AHIP, *About AHIP*, https://www.ahip.org/about-ahip; *Member Organization* *https://www.ahip.org/membership* (last visited Aug. 29, 2024).

[29]    AHIP, *Board of Directors*, https://www.ahip.org/board-of-directors (last visited Aug. 29, 2024)

148.   Notably, due to the artificial suppression of out-of-network healthcare reimbursement rates caused by MultiPlan's repricing tools, some healthcare providers have already stopped treating patients with certain healthcare plans.

149.   Defendants have also not engaged in self-interested behavior that would risk the conspiracy's effectiveness.

150.   For example, Defendants and other competitors of MultiPlan have not kept repricing activities in-house, despite the clear savings to do so.

151.   **Exchange of Information**. Defendants and their competitors are unlikely to exchange large volumes of competitively sensitive information in the absence of an agreement that others would do the same.

152.   But here, MultiPlan, Insurer Defendants, and other competing health insurance companies have agreed to exchange data regarding health care providers' claims, reimbursement offers made in response to those claims, and the actual amount paid on those claims.

153.   Defendants' information exchange is the type that courts have recognized as likely to have anticompetitive effects. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 441, n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anti-competitive effects").

154.   Competing companies would not ordinarily risk sharing their real-time, competitively sensitive pricing information with their rivals. Moreover, they would not simultaneously pay those rivals — in this case MultiPlan — millions of dollars absent an agreement to restrain competition. Defendants' information exchange is more consistent with an agreement to restrain trade than with competition on the merits. Therefore, this type of information exchange is circumstantial evidence of an anticompetitive agreement among competitors.

### I.   The Conspiracy Achieved the Goal of Fixing and Suppressing Out-of-Network Claim Reimbursement Rates.

155.    To achieve the goal of suppressing out-of-network reimbursement rates on a mass scale (and profiting massively therefrom), an important component of the conspiracy was to ensure buy in from as many of the largest health insurance companies in the United States. By this measure, the conspiracy has been a success. By 2021, MultiPlan's clients included "all of the top 10 insurers in the U.S." and since then, the share of Insurer Defendants in the conspiracy has only expanded to include all of the top 15 insurers based on market share used its claim repricing tools to artificially suppress the reimbursement rate for out-of-network claims. An investor presentation identified those insurers by name, specifically mentioning United Healthcare, Aetna, Cigna, Humana, HCSC, and Centene.

156.    As of 2022, those top 15 insurers accounted for 63.69% of the health insurance market, giving the conspiracy members enormous power in the out-of-network Reimbursement Market and over healthcare providers, and that percentage does not account for the additional 700 insurer customers which also reinforces the dominance of the MultiPlan conspiracy.

157.    According to MultiPlan, that customer base will happily continue to contribute to the conspiracy, since in the words of Churchill Capital's CEO Michael Klein, MultiPlan has achieved "payer lock."

158.    In the same breath, MultiPlan also extolled its lock on providers. Due to the pricing power achieved by MultiPlan and its co-conspirators, healthcare providers must accept MultiPlan's artificially suppressed out-of-network reimbursement rates. Recently, MultiPlan cited acceptance rates of its artificially suppressed reimbursement rates of 99% and 98%.

159.    These high acceptance rates do not reflect the validity of MultiPlan's repricing methodology. They arise because the price-fixing agreement between Defendants has snuffed out competition and left providers, such as Plaintiff, no choice but to accept the artificially suppressed reimbursement rates.

160.    It is practically impossible for healthcare providers to meaningfully negotiate or pursue dispute resolution with respect to individual claims. Accordingly, any "negotiation" with MultiPlan starts from the position of MultiPlan's collusive offer to radically underpay healthcare providers for their services, and invariably ends with MultiPlan forcing the healthcare provider to capitulate to an extreme underpayment. Due to the conspiracy's size and conspirators' market share, healthcare providers practically cannot turn elsewhere to seek reimbursement for out-of-network claims.

161.    If a provider *does* attempt to negotiate with MultiPlan, or refuses to accept MultiPlan's initial reimbursement rate, then the conspiracy's coercive tactics truly appear. MultiPlan will then attempt to impose an *even lower* rate on the provider. For example, in one fax to a doctor, MultiPlan gave the doctor only eight days to respond to its cut- rate reimbursement offer. It then threatened that, "[i]f you do not wish to sign the attached proposal, this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." Others have reported deadlines of mere hours. Healthcare practices and their billing specialists say that MultiPlan has followed through on these threats. As one woman in charge of billing for a healthcare provider put it: "It's not a real negotiation." In other words, in its role as a "mafia enforcer for insurers," MultiPlan gives providers an "offer" they cannot refuse—accept the cut-rate reimbursement or experience it cut even further.

162.    A New York Times article confirms the providers' inability to negotiate with MultiPlan. The newspaper reported, "[d]ocuments and interviews revealed tactics meant to pressure medical practices to accept low payments. Some offers came with all-caps admonitions and deadlines just hours away. Accept and receive prompt payment; refuse and risk an even lower payout. Practices

and billing specialists said this often wasn't an empty threat."[30]

163.     MultiPlan's former employees explain that the company fostered a culture that promoted artificially suppressing reimbursement rates in part by linking employee bonuses to these suppressed rates. Predictably, therefore, MultiPlan, through its employees, would employ harsh negotiation techniques, such as sending reimbursement offers to providers accompanied by "all-caps admonitions." One former negotiator described herself as "a bit of viper," who "wanted to go in as hard as I could because my bonus is affected." Another negotiator admits that she "knew [the artificially suppressed reimbursement rates] were not fair" and would call providers from her cellphone to advise against accepting the artificially suppressed reimbursement.[31]

164.     Adding more financial pressure on providers, any refusal of MultiPlan's first offer only causes delayed payment of the claim.

165.     Healthcare providers also cannot negotiate directly with other non-MultiPlan Payors, including the Insurer Defendants. MultiPlan controls the entire out-of-network claims handling process for these payors—from setting the reimbursement rate and sending it to the provider to "negotiating" any changes to the rate and satisfying the claim. The non-MultiPlan Payors have outsourced not only pricing decisions, but also claim collection, to MultiPlan. As explained above, MultiPlan encourages this because it collects real-time, proprietary claims data from all the Insurer Defendants and co-conspirators and knows that their proposed reimbursed rates align due to the conspiracy, giving it a greater ability to "push for savings." If a provider's billing department asks an insurer, such as the Insurer Defendants, to justify its low-ball reimbursement rate, the insurance

_____

[30] Hambly, Chris. "Insurers Reap Hidden Fees by Slashing Payments. You may get the bill." New York Times. Apr. 7, 2024. https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (Last visited Aug. 29, 2024)

[31] *Id.*

company will protest that it has no responsibility for MultiPlan's pricing. At the same time, MultiPlan will refuse to negotiate with providers because it is not the insurer. This scheme occasionally, and intentionally, gives providers nobody with whom to negotiate. In fact, in recent years, some Payors have taken advantage of MultiPlan's offer to make claims entirely non-negotiable.

166.     The conspiracy has substantially affected the out-of-network Reimbursement Market and healthcare providers, such as Jefferson and the Class. MultiPlan itself claims that rates for these providers generally fall between "61%-81% off billed charges."

167.     In a 2021 roadshow presentation, MultiPlan compared the payments a doctor would expect to receive with and without MultiPlan involved in the out-of-network reimbursement process. Without MultiPlan, the doctor would receive $800 for the service. With MultiPlan, the doctor receives only $600, or 25% less.

168.     The New York Times reports that, in one example, UnitedHealthcare, using MultiPlan's services, paid a doctor just $5,449.27 for performing a lengthy, complicated procedure to repair tissue and close a wound on a patient whose incision from heart surgery had failed to heal.[32] In meantime, the patient was saddled with a bill exceeding $100,000 leaving no doubt that the conspiracy's aim is not to advance consumer welfare.

169.     In another example, UnitedHealthcare covered only $7,879 of a $152,594 bill, or just more than 5% of the bill, but charged the employee health plan a $50,650 processing fee.

170.     By agreeing to not compete with its competitors on the reimbursement of out-of-network claims, all Defendants benefit. Both MultiPlan and the Insurer Defendants pay less to healthcare providers by artificially suppressing the reimbursement rate for out-of-network claims. In 2018, MultiPlan told investors that it identified "savings"—underpayments to healthcare providers—

---

[32] *Id.*

for its 700+ customers that totaled $19 billion. By 2023, that number approached $23 billion. MultiPlan gets the added benefit of taking a cut of those "savings" from its co-conspirators.

171.     The conspiracy's underpayments to health care providers have created a heavy burden for healthcare providers, some even declaring bankruptcy because of the reduced reimbursement rates—MultiPlan has profited handsomely. Over the course of the conspiracy, the claim repricing tool Data iSight increased from $23 million in 2012 to $323.7 million in 2019 and Analytics-based services, like claims repricing tools, accounted for 59% of MultiPlan's revenue as of 2020. That figure has only grown, accounting for $709 million of MultiPlan's $1.1 billion in total revenue in 2021. In 2022, analytics-based services accounted for 66% of MultiPlan's revenue. During this time, MultiPlan consistently had profit margins "in excess of 70%."

172.     Due to the conspiracy's success in artificially suppressing out-of-network reimbursements, Defendants now plan to artificially suppress in-network healthcare claims. In a 2020 presentation to investors, MultiPlan shared its "Vision for MultiPlan 3.0," pursuant to which MultiPlan would "extend into in-network" repricing services. In other words, it would bring its claim repricing tools "to the in-network market" as part of a "cost management" strategy.

### J.  MultiPlan and Insurer Defendants also Operate as a "Hub and Spoke" Conspiracy

173.     Defendants' conduct also can be characterized as a per se illegal hub-and-spoke price-fixing agreement that violates Section 1 of the Sherman Act. MultiPlan acts as the conspiracy's hub. The repricing services agreements between MultiPlan, the Insurer Defendants, and the co-conspirators are the spokes. The agreement between the Insurer Defendants and co-conspirators to collectively use MultiPlan's claim repricing tools to reprice out-of-network reimbursement claims while knowing that each other are doing the same is the conspiracy's rim.

174.     As successful lawsuits regarding Ingenix demonstrate, healthcare providers could combat attempts to underpay them before the conspiracy became effective on July 1, 2017, when

UnitedHealthcare started using MultiPlan. In addition to seeking redress in the courts, they could refuse to provide non-emergency care to patients from insurance networks that attempted to bilk them out of fair reimbursement rates and instead provide those non-emergency services exclusively to the patients belonging to other insurance networks. Commercial health insurance companies realized, therefore, that they must act collectively and with the assistance of an outside repricing entity to suppress out-of-network reimbursement rates.

175.    As the New York Times reported, a 2015 email from a Cigna executive reminded colleagues of a key consideration." Eva Borden, Cigna's Chief Risk Officer, made her company's position clear: "[w]e cannot develop these chargers internally (think of when Ingenix was sued for creating out-of-network reimbursements—we need someone (external to Cigna) to develop acceptable" rates.[33]

176.    MultiPlan marketed itself as the answer to the Insurer Defendants' collective action problem. It would act as a hub that the Insurer Defendants could use to work together to suppress payments for out-of-network reimbursement claims. As MultiPlan's Paul Galant, later described to investors in 2020, using MultiPlan is a "much better mechanism" for Payors to collectively under pay providers "versus doing it themselves." According to MultiPlan, this is because "if a pay[o]r decides to do everything on their own, their ability to go back to providers and push for savings is fundamentally different than ours. [W]e can talk to the entire industry."

177.    As a New York Times expose[34] reports, the recruitment of UnitedHealthcare by MultiPlan is indicative of its effort to form the center of a larger conspiracy and the agreement of

[33] *Id.*

[34] Hamby, Chris, "*Collusion in Health Care Pricing? Regulators are Asked to Investigate*", New York Times, May 1, 2024, https://www.nytimes.com/2024/05/01/us/multiplan-health-insurance-price-fixing.html (last visited Aug. 29, 2024).

Insurer Defendants to share data through the same repricing strategy. Prior to UnitedHealthcare's agreement with MultiPlan in July of 2017, MultiPlan's Dale White made clear that 70% of UnitedHealthcare's top 10 competitors used Data iSight to reprice out-of-network reimbursement claims.

178.    MultiPlan's Dale White, "did not specifically name competitors," but UnitedHealthcare executive, Lisa McDonnel wrote afterward that "from what he did say we were able to glean who was who."[35] Accordingly, "to bring[] UnitedHeath back into alignment with its primary competitor group on managing out-of-network costs," it needed to start using MultiPlan's repricing tools.

179.    A United Healthcare executive lamented in sworn testimony that the company had fallen "behind some of [its] largest competitors" when it came to using MultiPlan's repricing tools to set the rate for reimbursing out-of-network claims. And according to UnitedHealthcare's Vice President of Network Payment Strategy, Rebecca Paradise, knowing that Data iSight "was widely used by our competitors" factored critically into UnitedHealthcare's decision to join the conspiracy.

180.    In addition to informing UnitedHealthcare about where it stood on pricing among its peers, MultiPlan recommended that UnitedHealthcare should set its reimbursement rate accordingly. Mr. White relayed to another United executive, John Haben, by agreeing to use a percentage of Medicare rates for the formula in Data iSight, United would "be in line with another competitor" and "leading the pack along with another competitor." Mr. Haben summarized MultiPlan's recommendation in a 2017 email and presentation he sent to senior management at United entitled "OCM [Outlier Cost Management]-MultiPlan Benchmark Pricing Overview." In the email, Mr. Haben wrote, "[t]oday, our major competitors have some sort of outlier cost management; they use

---

[35] *Id.*

Data iSight. United will be implementing July 1, 2017." Mr. Haben also went on to explain that the agreement between United and MultiPlan could "improve"—i.e., cut—UnitedHealthcare's OON claim reimbursement payments "by $900 million" per year

181.    Former UnitedHealthcare executive John Haben also testified that, throughout the conspiracy, MultiPlan provided UnitedHealthcare with information about competitor pricing.

182.    Although the agreement between UnitedHealthcare and MultiPlan formed only one spoke of the conspiracy, *every* agreement between MultiPlan and its 700+ payor customers, including the agreements between MultiPlan and the top 15 health insurance payors, is another spoke in the hub-and-spoke conspiracy. MultiPlan convinced these other payors to use its claim repricing tools by using similar tactics to those it employed with United Healthcare, i.e., by advertising these tools as a way for Payors to align reimbursement rates with their competitors.

183.    MultiPlan then encouraged continued commitment to the conspiracy by telling the "spokes" about which of their competitors used the claim repricing tools and how those tools allowed those competitors to profit by artificially suppressing reimbursements for out-of-network claims. MultiPlan itself arranged for Client Advisory Board meetings where the spokes of this conspiracy, the Insurer Defendants and co-conspirators, could come together to discuss how to better use MultiPlan to effectuate their anticompetitive scheme.

184.    Insurer Defendants' statements make it clear that they participate in the conspiracy because they know that their co-conspirators have agreed to do the same. UnitedHealthcare calls MultiPlan's tools and fees "an industry-standard approach." Similarly, Cigna describes the shared savings fee as in "align[ment] with industry standards."

185.    That Insurer Defendants knowingly shared sensitive information regarding their own claims pricing through the MultiPlan system confirms the agreement between the Insurer Defendants and co-conspirators to depart from the traditional UCR pricing model or the later FAIR health

benchmarks and instead use MultiPlan as a hub to fix the price for reimbursement of out-of-network claims, thereby evidencing the conspiracy's rim. Likewise, in a 2019 email, a UnitedHealthcare senior vice president emphasized creating a "sense of urgency" and helping companies still using FAIR Health "understand they don't want to be on that program anymore."[36]

186.     The same circumstantial evidence presented above also supports a "rim" agreement between Insurer Defendants to use MultiPlan's claim repricing tools to suppress reimbursement rates on out-of-network claims and plus factors tend to exclude the possibility that unilateral decisions resulted in this parallel conduct.

### K.  The Conspiracy Is Per Se Illegal

187.     With knowledge that its competitors would do the same, Insurer Defendants' provided sensitive, nonpublic claims data to MultiPlan and agreed to use the same method (MultiPlan's repricing tools and algorithms), to fix out-of-network health service reimbursement rates. The result is clearly anticompetitive, offering no procompetitive benefits, rendering the conspiracy a per se illegal restraint of trade in violation of the Sherman Act.

### L.  The Conspiracy Results in Anticompetitive Harm with No Procompetitive Benefits

188.     The conspiracy has resulted in Defendants paying far less in out-of-network reimbursement claims to healthcare providers than they would in the absence of the conspiracy.

189.     Absent this conspiracy, Defendants would be forced to compete by making adequate payments for out-of-network healthcare services so that their insureds could have access to a variety of healthcare providers, both in and outside their network.

190.     The most obvious harm is the underpayment of claims for out-of-network services

---

[36] Hambly, Chris, "*Insurers Reap Hidden Fees by Slashing Payments. You may get the bill*." New York Times, Apr. 7, 2024, https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (last visited Aug. 29, 2024).

which results in less money to providers for out-of-network services. This results in providers having less to spend on providing medical care to patients including: staff salaries, improvements to facilities, medication, and equipment. Defendants have systematically paid sub-competitive reimbursements for out-of-network healthcare services, which reduces the revenue available to healthcare providers to improve and expand access to healthcare.

191.    In addition, Plaintiff and Class Members are forced to accept MultiPlan's offered reimbursement rates because, if a provider rejects the offer, it may take months to receive any payment and most of the time that payment does not exceed the original offered amount by MultiPlan In some cases, as retribution, MultiPlan will *reduce* the original offered reimbursement rate even further if the healthcare provider refuses to accept.

192.    Healthcare providers report that MultiPlan has rewarded them for inflating the prices they charge for services. Indeed, healthcare providers must do this just to receive MultiPlan's artificially suppressed reimbursement rates.

193.    MultiPlan's negotiated rates ultimately have no effect on the amounts that providers bill. For instance, if a provider previously accepted a lower rate from a Payor, MultiPlan does not offer the same price for a subsequent claim of the same type, but rather seeks the percentage gap between the provider's bill and the previously negotiated price the provider accepted. Thus, the provider can only get the negotiated price again by charging the same price for services he charged the first time around, even though both the provider and MultiPlan know that negotiations yielded a lower price previously. For example, one provider noted that he typically received $6,000 to $8,000 for a service but had to bill $18,000 to $32,000 to get paid that $6,000 to $8,000 amount from MultiPlan and its affiliated health plans. Building in this inefficiency further discourages negotiations and needlessly raises healthcare costs

194.    Defendants also wield their market power to enforce compliance with these

48

artificially low reimbursement rates, with the vast majority of providers accepting the sub-competitive rates as often as 99.4% of the time and appeal them as infrequently as 2% of the time.

195.    Defendants claim that the conspiracy reduces consumer healthcare costs thereby creating a procompetitive benefit; However, even if Defendants were to proffer some de minimis procompetitive benefit from their misconduct, it could not ameliorate the significant anticompetitive effects.

196.    As one healthcare analyst explained:

> Theoretically, MultiPlan's harsh negotiation tactics should be good for rising American health care costs; insurers are supposed to lower costs by negotiating lower prices on behalf of the patient. But instead, MultiPlan acts like a mafia enforcer for insurers, forcing doctors to accept low payments while insurance premiums for patients . . .somehow continue to rise.[37]

197.    The Centers for Medicare and Medicaid Services found that out-of-pocket health expenditures increased $67.3 billion, or 18.3%, from 2016, the year before the conspiracy started, to 2021. It projects another $86.4 billion in increased out-of-pocket expenditures between 2021 and 2025, equating to a 42% increase in out-of-pocket health care expenditures during the conspiracy.

198.    Private health insurance expenditures have seen similar increases: $180.6 billion, or 17.5%, from 2016 to 2021, with another $320.8 billion between 2021 to 2025, for a 48.6% increase in private health insurance expenditures during the conspiracy.

199.    MultiPlan also claims that its repricing tools, makes providers "less likely to balance bill members." But patients tell a different story. For example, one patient received a bill exceeding $100,000 after UnitedHealthcare, relying on MultiPlan's claim repricing tools, paid only $5,449.27

---

[37] Olivia Webb, *MultiPlan, the secret back-end to most of the insurer industry, is going public* (Aug. 5, 2020) Acute Condition, available at https://www.acutecondition.com/p/multiplan-thesecret-back-endto#:~:text=Theoretically%2C%20MultiPlan's%20harsh%20negotiation%20tactics,on%20behal f%20of%20the%20patient.

49

to a doctor who performed a lengthy, complicated procedure. Another patient who received a large bill from her therapist due to MultiPlan's claim repricing tools stopped receiving the therapy she needed due to the expense, explaining that "they basically took away the mental health care I was getting." One woman incurred tens of thousands in bills for opioid addiction treatment for her teenage son because of her insurer's use of MultiPlan's repricing tools. Another woman who received insurance through Aetna incurred about $60,000 in medical bills to see a specialist for her chronic back pain.

200.     Defendants' misconduct has increased their revenues and profits, while significantly harming competition, healthcare providers, and patients.

## INTERSTATE COMMERCE

201.     Defendants' conduct has substantially affected and will continue to substantially affect interstate commerce throughout the United States. Plaintiff and other healthcare providers, who are reimbursed for out-of-network services by Defendants, provide services, goods, and facilities to people who reside throughout the United States. Defendants also operate PPOs throughout the United States. Thus, Defendants' conspiracy intentionally, directly, substantially, and reasonably foreseeably affects interstate commerce in the United States.

## FRAUDULENT CONCEALMENT

202.     Defendants have affirmatively and fraudulently concealed the conspiracy by various means and methods from at least July 1, 2017, through the present. Until shortly before the filing of this Complaint, Plaintiff and other Class Members (i) had neither actual nor constructive knowledge of the facts giving rise to the claims for relief, and (ii) did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy.

203.     Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiff and other class members on actual, constructive, or inquiry

notice.

204.    Defendants intentionally conducted their anticompetitive scheme outside of public scrutiny:

      A.    The Insurer Defendants privately submitted their own claims data to MultiPlan, and MultiPlan in turn used its repricing tools, the details of which remain confidential, to recommend reimbursement rates;

      B.    Defendants regularly attended invitation-only industry events, including ones MultiPlan held and sponsored, where they secretly discussed behind closed doors how MultiPlan's repricing tools allowed them to reduce costs by suppressing out-of-network reimbursement rates; and

      C.    Defendants had private communications and meetings to discuss out-of-network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Defendant's competitors.

205.    Although MultiPlan purports to explain its pricing methodology to providers, it and the Insurer Defendants intentionally concealed from Plaintiff and other Class Members the fact that they outsourced pricing of out-of-network reimbursement claims to a shared pricing system that used Defendants' real-time, non-public claims data and combined it with their competitors' real-time, non-public claims data to set and suppress out-of-network reimbursement rates.

206.    Defendants, as competitors, consciously and intentionally entered into unlawful, horizontal agreements to artificially suppress out-of-network reimbursements to healthcare providers. Those agreements contain non-disclosure and confidentiality clauses that prevent dissemination of the contracts' terms. Because Plaintiff and other Class Members are not parties to those agreements, they did not know of and could not reasonably access the contract terms.

207.    MultiPlan made materially false and misleading statements to conceal that it colluded with its competitors to artificially suppress payments to healthcare providers.

208.    MultiPlan publicly states that it is not a commercial health insurance company. For instance, a banner at the top of its internet homepage states, in bold: "We are not an insurance company." Elsewhere on its website, MultiPlan also makes statements that it is not a health insurance

company nor does it sell insurance. And in the "About MultiPlan" section of its press releases, MultiPlan describes itself as the "partner" of health insurance companies, nowhere disclosing that it is also a health insurance company.[38]

209.    Because MultiPlan is a health insurance company, these statements are, at best, materially misleading. MultiPlan operates one of the largest and most well-established PPO networks in the United States.

210.    Indeed, like other health insurance networks, users access healthcare providers in MultiPlan's PPO network for a fee. MultiPlan then administers and adjudicates claims for healthcare services in that network. Unlike the case of other health insurance networks, MultiPlan opts to negotiate with other health insurance companies, instead of employers or individual subscribers, to access its network. MultiPlan's statements that it is "not a health insurance company" are materially false; however, MultiPlan repeatedly made these statements intending for Plaintiff and other Class Members to rely on them.

211.    Through Defendants' knowing and active concealment of their misconduct, Plaintiff and other Class Members did not receive information that would have put them, or any reasonable person or provider standing in their shoes, on sufficient notice of facts warranting further investigation.

212.    Plaintiff and other Class Members could not have had inquiry notice of Defendants' challenged conduct before March 7, 2022, when an article on The Capitol Forum website first raised

---

[38] Churchill Capital & MultiPlan, *Virtual Analyst Day* (Aug. 18, 2020), https://www.multiplan.us/wpcontent/uploads/2020/08/MultiPlan-Inc.-Sell-Side-Analyst-Day-Presentation-Transcript.pdf., at 24; Churchill Capital & MultiPlan, *Investor Presentation* (July 2020),https://www.scribd.com/document/503583215/2020-07-Churchill-MultiPlan-Public-Announcement-Presentation-vFFF at 20.

concerns about MultiPlan's antitrust compliance.[39] Even that article and the law professors quoted in it, however, did not conclusively state that MultiPlan's practices violated the antitrust laws. An ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover the misconduct challenged in this Complaint.

213.     Moreover, no other litigation involving MultiPlan would have contained sufficient information to alert Plaintiff and other Class Members to the antitrust claims alleged herein. For instance, one suit involved in-network claims and did not allege antitrust violations.[40] Another did not allege a conspiracy between MultiPlan and health insurance companies or raise an antitrust claim.[41] Two others focused only on the relationship between MultiPlan and one health insurance provider; and one of those suits did not raise an antitrust claim.[42] Finally, the Verity antitrust lawsuit filed in California state court, like the others involving MultiPlan, did not put Plaintiff and other Class Members on notice of the claims asserted herein. The antitrust laws apply to reimbursement payments made to healthcare providers. Until shortly prior to the filing of the Complaint, Plaintiff and other Class Members reasonably considered the Reimbursement Market to be competitive.

214.     Plaintiff and other Class Members exercised reasonable diligence at all relevant times. They could not have discovered Defendants' challenged conduct sooner by exercising reasonable diligence because of Defendants' efforts to fraudulently conceal their misconduct. Since discovering the possibility of anticompetitive conduct, Plaintiff has acted diligently to investigate

---

[39] *"Multiplan: Company's Information Sharing, Meetings Practices Could Raise Antitrust Concerns, Experts Say"*, The Capitol Forum, Mar. 7, 2022, https://thecapitolforum.com/multiplan-companys-information-sharing-meetings-practices-could- raise-antitrust-concerns-experts-say/

[40] *See Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co.*, No. 17-cv-2055 (D.N.J.).

[41] *See Hott v. MultiPlan, Inc.*, 21-cv-02421 (S.D.N.Y.).

[42] *See LD v. United Behav. Health*, 4:20-cv-2254 (N.D. Cal.) (no antitrust claim); *Pac. Recovery Sols. v. United Behav. Health*, 4:20-cv-2249 (N.D. Cal.).

Defendants' anticompetitive behavior.

215. Defendants' fraudulent concealment has tolled and suspended the running of the statute of limitations with respect to the claims and rights of Plaintiff and other Class Members, including with respect to the time period preceding the four year period prior to the filing of this Complaint.

## CONTINUING VIOLATION

216. Defendants' conduct has resulted in a continuing violation against Plaintiff and other Class Members. After the formation of the conspiracy, Defendants committed and have continued to commit overt acts that are part of the ongoing violation and have not terminated or withdrawn from the conspiracy.

217. For example, Defendants frequently meet at Client Advisory Board meetings and other ad hoc meetings between MultiPlan and its customers to discuss how to improve the conspiracy to suppress out-of-network reimbursement rates to healthcare providers.

218. Defendants continue to renew their MultiPlan contracts to strengthen and continue the conspiracy. These new agreements, including a 2022 contract between MultiPlan and the largest commercial health insurer conspirator UnitedHealthcare, are continuing violations of the antitrust laws.

219. Defendants have continued to take overt action, including new acts beyond the initial conspiracy agreement, to continue the efficacy of the conspiracy. These overt acts have continued from at least July 1, 2017, through the present.

220. These continuing violations have tolled and suspended the running of any statute of limitations concerning the claims and rights of Plaintiff and other class members, including with respect to the time period preceding the four-year period prior to the filing of this Complaint.

## ANTITRUST INJURY AND STANDING

221.    This conspiracy directly and proximately damages Plaintiff's and other Class Members in their businesses and property and unlawfully restrains competition in the Reimbursement Market.

222.    Plaintiff and other Class Members have directly sustained and continue to sustain economic losses and damages proximately caused by Defendants artificially suppressing the reimbursement rate for out-of-network healthcare services. The full amount of such losses and damages can be calculated following discovery and proved at trial.

223.    But for Defendants' conduct challenged herein, Plaintiff and other Class Members would have received fair and competitive reimbursements for their out-of-network healthcare services.

224.    While the conspiracy continues, Plaintiff and other Class Members will continue to suffer losses proximately caused by such conspiracy.

225.    The antitrust laws aim to prevent conduct which harms competition. Plaintiff and other Class Members suffered injury from a conspiracy among buyers to systematically suppress the price paid for a good or service, such as out-of-network healthcare services. It is well-recognized that agreements to reduce price competition or fix prices violate the antitrust laws. MultiPlan's claim repricing tools to set collusive, artificially suppressed reimbursements rates undermines the competitive process sought to be advanced by antitrust law by depriving the market of "independent centers of decision-making" and replacing them with decision- making on prices by one shared pricing "brain."

## CLASS ACTION ALLEGATIONS

226.    Plaintiff brings this action on behalf of itself and the following class ("Class") of all others similarly situated under Federal Rule of Civil Procedure 23(a) and (b)(3):

All persons or entities whom one or more of Defendants or co-conspirators, or a division, subsidiary, predecessor, agent, of affiliate of such entities, have reimbursed for out-of-network healthcare services from no later than July 1, 2017, until Defendants' unlawful conduct and anticompetitive effects cease. The Class excludes federal and state governmental entities and judicial officers presiding over this case.

227.    The Class is so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff believes that there are at least hundreds, if not thousands, of members in the Class.

228.    Class Members can be readily identified and notified in an administratively feasible manner using, among other information, the Class members' electronic records of out-of-network claims reimbursements and from similar information from records in Defendants' possession.

229.    Plaintiff's claims are typical of those of other Class Members' claims in that all Class Members were damaged by the same anticompetitive and collusive conduct (i.e., Defendants' alleged violations of the Sherman Act causing them to receive reimbursements for out-of-network claims that were lower than what they would have received absent the illegal conduct.

230.    Plaintiff's interests fully align with and are not contrary or antagonistic to the interests of Class Members. Thus, Plaintiff will fairly and adequately protect and represent the interests of the Class. In addition, Plaintiff's counsel is comprised of experienced antitrust attorneys with significant experience successfully prosecuting complex antitrust class actions, and they possess the resources needed to vigorously litigate the case.

231.    Questions of law and fact are common to the Class and susceptible to proof by common evidence. Questions of law and fact common to members of the Class include, but are not limited to:

      A.    Whether Defendants formed a horizontal agreement, combination, conspiracy, or common understanding in which they artificially suppressed out-of-network healthcare service reimbursement rates throughout the United States;

      B.    Whether, in the alternative, Defendants formed a hub-and-spoke

agreement, combination, conspiracy, or common understanding in which they artificially suppressed out-of-network healthcare service reimbursement rates throughout the United States;

C.    Whether Defendants' alleged illegal conduct constitutes a per se violation of the Sherman Act;

D.    Whether, in the alternative, Defendants' alleged illegal conduct, violates Section 1 of the Sherman Act pursuant to a quick look or full Rule of Reason analysis;

E.    Whether Defendants' alleged illegal conduct caused Class Members throughout the United States to receive artificially suppressed reimbursements on out-of-network healthcare service claims;

F.    The proper measure of Class-wide damages;

G.    Aggregate damages suffered by Plaintiff and all Class Members;

H.    The scope and extent of injunctive relief; and

I.    Whether Defendants engaged in fraudulent concealment of the existence of the alleged conspiracy or committed continuing antitrust violations beyond the initial conspiratorial agreement, thereby tolling the statute of limitations.

232.    These and other common questions of law and fact will predominate over any individualized legal or factual questions.

233.    Courts have routinely found that cases alleging antitrust violations, including price-fixing allegations as here, entail common legal and factual questions which predominate over any possible individualized issues, thus warranting class certification.

234.    The class action mechanism is superior to any other alternative method for the fair and efficient adjudication of this controversy. Proceeding as a class action not only allows the many Class Members to prosecute their common claims against Defendants, but also allows Defendants to defend themselves in one court simultaneously and efficiently without the unnecessary duplication of effort and expense presented by separate actions. The benefits of proceeding as a class action far outweigh any difficulties that may arise in the management of this case as a class action.

## CAUSES OF ACTION

### COUNT ONE
### Horizontal Conspiracy in Restraint of Trade
### Violation of Section 1 of the Sherman Act
### (15 U.S.C. § 1)

235.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth above.

236.    On behalf of itself and all other Class Members, Plaintiff seeks monetary and injunctive relief for Defendants' conduct in violation of Section 1 of the Sherman Act under Section 4 of the Clayton Antitrust Act.

237.    No later than July 1, 2017, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

238.    The contract, combination, or conspiracy alleged herein has consisted of an agreement between and among Defendants to knowingly and collectively use MultiPlan's repricing tools to set reimbursement rates for out-of-network healthcare services.

239.    This conspiracy has caused Plaintiff and other Class Members, to receive artificially suppressed reimbursements for out-of-network healthcare services during the Class Period.

240.    The contract, combination, or conspiracy has taken the form of a horizontal conspiracy between competitors in the United States commercial health insurance market.

241.    In the alternative, the contract, combination, or conspiracy has taken the form of a horizontal conspiracy between competitors, Insurer Defendants, and a potential competitor, MultiPlan, in the United States commercial health insurance market.

242.    Defendants possess substantial market power in a relevant antitrust market (the market for reimbursements of healthcare services claims by commercial Payors).

243.    The relevant product market is reimbursements of out-of-network healthcare

services claims by commercial Payors.

244.    The relevant geographic market is the United States.

245.    Defendants' unlawful conduct in the form of a contract, combination, or conspiracy has led to anticompetitive effects.

246.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff has been injured in its business or property and will continue to be injured in its business and property by receiving lower reimbursements for out-of-network healthcare services claims than what it would have received absent the conspiracy.

247.    There are no procompetitive justifications for the Defendants' conspiracy, and to the extent any proffered procompetitive justifications exist, they could have been achieved through less restrictive means.

248.    Defendants' conspiracy is a per se violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Act under either a quick look or full Rule of Reason analysis.

249.    Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them, interest on those damages, together with reasonable attorney's fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

250.    Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

**COUNT TWO**
**Hub-and-Spoke Conspiracy in Restraint of Trade**
**Violation of Section 1 of the Sherman Act**
**(15 U.S.C. § 1)**
**(Pled in the alternative to Counts 1 and 3)**

251.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth above.

252.     In the alternative to Count One, and as detailed above, the contract, combination, or conspiracy to unreasonably restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in which MultiPlan served as the hub, the agreements between MultiPlan and the Insurer Defendants and co-conspirators to use MultiPlan's claim repricing tools served as spokes, and the agreement between the spokes to use MultiPlan's repricing tools to reprice reimbursement rates for out-of-network healthcare services claims serve as the rim. This conduct, which began no later than July 1, 2017, violates Section 1 of the Sherman Act.

253.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tools. This conspiracy has caused Plaintiff and Class Members to receive artificially suppressed reimbursements on claims for out-of-network healthcare services during the Class Period.

254.     To further this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

255.     Defendants possess substantial market power in a relevant antitrust market (the market for reimbursements of healthcare services claims by commercial Payors).

256.     The relevant product market is reimbursements of out-of-network healthcare services claims by commercial Payors.

257.     The relevant geographic market is the United States.

258.     Defendants' unlawful conduct in the form of a contract, combination, or conspiracy has led to anticompetitive effects.

259.     As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and Class Members have been injured in their business or property and will continue to be injured in their business and property by receiving lower reimbursements for out-of-network healthcare services claims than what it would have received absent the conspiracy.

260.     There are no procompetitive justifications for the Defendants' conspiracy, and to the extent any proffered procompetitive justifications exist, they could have been achieved through less restrictive means.

261.     Defendants' conspiracy is a per se violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Act under either a quick look or full Rule of Reason analysis.

262.     Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them, interest on those damages, together with reasonable attorney's fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

263.     Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel as separately requested and as indicated below, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B.     The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.     Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D.     Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents, and employees thereof, and all other people acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any

other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; Plaintiff and the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

E.      Plaintiff and the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and

F.      Plaintiff and the Class be awarded any other relief as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

Dated: August 30, 2024             Respectfully submitted,

*/s/ S. Jarret Raab*
S. Jarret Raab
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
(866) 252-0878
jraab@milberg.com

Peggy J. Wedgworth (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
405 East 50th Street
New York, NY 10022
(212) 594-5300
pwedgworth@milberg.com

Andrew Lemmon (*pro hac vice forthcoming*)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(985) 783-6789
alemmon@milberg.com

*Counsel for Plaintiff and the Proposed Class*